**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSE TIRADO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 5146** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jose Tirado brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a summary judgment motion seeking reversal of the Administrative Law Judge's decision, and the Commissioner filed a cross-motion for summary judgment seeking affirmance of the decision. After careful review of the parties' briefs and the record, the Court now denies Plaintiff's motion and grants the Commissioner's motion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on April 24, 2008, alleging that he became disabled beginning on February 7, 2007 due to pain and limited mobility caused by a back injury and degenerative disc disease. (R. 24, 214). The Social Security Administration denied

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, and is automatically substituted as Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

the application initially on July 14, 2008, and again on reconsideration on October 31, 2008. (R. 24). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Denise McDuffie Martin held a hearing on January 5, 2011, where she heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 48-81). On June 22, 2011, the ALJ found that Plaintiff was disabled from February 7, 2007 through July 27, 2009, but that he experienced medical improvement following surgery and physical therapy, and therefore beginning on July 28, 2009 was no longer disabled and was capable of performing jobs that exist in significant numbers in the regional economy. (R. 31-35). The Appeals Council denied Plaintiff's request for review on March 19, 2012. (R. 5-9).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In his motion, Plaintiff argues that the ALJ erred in three respects: (1) the ALJ mischaracterized the opinion of Plaintiff's physical therapist concerning Plaintiff's standing limitations; (2) the ALJ gave no weight to the written report of a vocational evaluator; and (3) the ALJ found Plaintiff not credible in part due to his lack of treatment.

## FACTUAL BACKGROUND

Plaintiff was born on August 9, 1964 and was 42 years old on his alleged disability onset date. (R. 30). He completed two years of college. (R. 223, 826). In 1988, he earned his commercial driver's license and for two years worked as a tractor-trailer truck driver for National Freight. (R. 826). In 1990, he began working as a truck driver and forklift operator, including loading and unloading trailers, for Conway Freight where he remained until his injury on February 7, 2007. (R. 56, 215, 826).

A.    **Plaintiff's Medical History**

1.    **Plaintiff's Back Injury**

On February 8, 2007, Plaintiff saw Dr. Rajeev Khanna of Advanced Occupational Medicine Specialists for evaluation of a lower back injury he sustained at work the prior day.  (R. 302-03, 306-07).  Plaintiff stated that he slipped on ice and snow while climbing on top of a dolly converter between two trailers, and landed on his lower back and buttocks.  (R. 302, 308).  He "noticed increasing pain and difficulty sitting," so he reported his injury to his employer.  (R. 302).  Plaintiff had no prior low back or tailbone injuries.  (R. 306).  During the evaluation, Plaintiff assessed his pain when sitting or walking as a ten on a scale from one to ten.  (*Id.*).  Dr. Khanna concluded that Plaintiff had lumbago (lumbar pain), a lumbar contusion, and paraspinal muscle spasms.  (R. 303).  He prescribed Ibuprofen and Cyclobenzaprine, restricted Plaintiff to sitting work only, advised him to ice his lower back three times daily, and referred him for physical therapy.  (*Id.*; 320).  Dr. Khanna noted that he "do[es] not anticipate any permanent disability."  (*Id.*).

Plaintiff began a round of six physical therapy sessions.  (R. 308-09, 313-19).  At a follow-up visit on February 26, 2007, Plaintiff had completed three sessions of physical therapy, had not returned to work, and was continuing to take Ibuprofen and Cyclobenzaprine.  (R. 300).  At his physical therapy session on March 2, 2007, Plaintiff reported his low back pain as a 5 or 6 on a scale of one to ten.  (R. 315).  That same day, his physical therapists noted that Plaintiff "has made significant improvements in pain levels, range of motion, and functional ability," but "continues to demonstrate slight restrictions in range of motion and pain and stiffness in the mornings lasting 30

minutes." (R. 308). They recommended two more weeks of therapy. (*Id.*). At his final follow-up visit with Dr. Khanna on March 5, 2007, Dr. Khanna noted that Plaintiff had completed physical therapy and his medications, and his conditions were "resolved." (R. 298-99).

On March 8, 2007, Plaintiff complained to Dr. Joseph Guidi at Rush-Copley Family Medicine that his low back pain returned when he went back to work. (R. 339). Upon Dr. Guidi's referral, Plaintiff underwent an MRI of his lumbar spine on April 3, 2007. (R. 352-53). The radiologist's impression consisted of a "bulging/protruding disc [that] accompanies mild degenerative change at L3-L4," "minor disc bulge at L4-L5," and "Grade I L5-S1 spondylolisthesis[2] that appears to accompany L5 spondylolysis."[3] (R. 352). Dr. Guidi prescribed NSAID pain relievers and physical therapy, and on April 10, 2007, he noted that Plaintiff is improving and will return to work after two more weeks of therapy. (R. 335-38). But on May 18, 2007, Plaintiff told Dr. Guidi that he hurt his back again while sweeping and cleaning out a truck. (R. 331). Dr. Guidi extended Plaintiff's light duty, but told Plaintiff that because he has been injured for "a long time," he may want to consider other options, such as surgery. (R. 332). On June 20, 2007, Dr. Guidi noted that Plaintiff was "much improved over the last 4 weeks from PT and chiropractic help, as well as anti-inflammatories." (R. 329). But on July 25, 2007,

---

[2] "Spondylolisthesis is a condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it," causing symptoms which may include lower back pain. MedlinePlus, a service of the U.S. National Library of Medicine and the National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/001260.htm (last viewed Sept. 10, 2013).

[3] "Spondylolysis is a specific defect in the connection between vertebrae, . . . [which] can lead to small stress fractures (breaks) in the vertebrae that can weaken the bones so much that one slips out of place, a condition called spondylolisthesis." Cleveland Clinic, http://my.clevelandclinic.org/disorders/Back_Pain/hic_Spondylolysis.aspx (last viewed Sept. 10, 2013).

Plaintiff reported that his back pain had worsened due to work, and that he was again unable to perform his job duties. (R. 327).

On August 7, 2007, Dr. Michael Dorning performed an Independent Medical Evaluation to assess whether Plaintiff could return to work. (R. 397-98). After reviewing Plaintiff's recent medical history and performing a physical examination, Dr. Dorning assessed Plaintiff with L5 spondylolysis with Grade I L5-S1 spondylolisthesis. (R. 397). He then concluded that "from a conservative treatment point of view, the patient has reached maximum medical improvement" and suggested referral to a spine surgeon for further evaluation. (*Id.*).

On August 9, 2007, Plaintiff saw neurosurgeon Dr. Douglas Johnson "for consultation regarding low back pain and left medial thigh pain." (R. 435-37). Plaintiff stated that his back pain fluctuates and is usually a 5 out of 10, but increases to an 8 out of 10 when most intense. (R. 435). Dr. Johnson recommended a treatment plan of physical therapy for strengthening combined with medications for muscle spasms and an anti-inflammatory. (R. 437). He advised that if "conservative therapy is not effective, surgery can be discussed." (*Id.*) The next day, Plaintiff transferred his primary care to Dr. Johnson. (R. 434). At a follow-up appointment on November 6, 2007, Plaintiff continued to complain of intermittent low back and left thigh pain, had begun physical therapy, and had not returned to work yet. (R. 431).

Plaintiff returned to Dr. Johnson on December 13, 2007, two days after beginning a trial with a TLSO brace. (R. 426). Plaintiff reported that he feels no back pain while wearing the brace, but that the pain returns as soon as he takes it off. (*Id.*) Plaintiff also reported that he no longer has the left leg pain. (*Id.*) Dr. Johnson advised Plaintiff to

continue physical therapy, wear the brace for a complete two-week trial, and refrain from work through January 2008. (R. 427, 465). On January 8, 2008, Dr. Johnson noted that Plaintiff reported improvement in his symptoms with the brace, and should proceed with a lumbar discogram (a test to evaluate back pain), which was subsequently scheduled for March 17, 2008. (R. 421, 424).

On January 16, 2008, Dr. Dorning completed another Independent Medical Evaluation to assess Plaintiff's ability to return to work. (R. 395-96). Dr. Dorning noted that Plaintiff has experienced improvement with the brace, but concluded that he does not believe Plaintiff can return to full-duty work at that time. (R. 395). He likewise recommended a discogram and concluded that Plaintiff may need to undergo a lumbar spine procedure depending on the discogram results. (R. 396).

On February 25, 2008, Plaintiff saw Dr. Narayan Tata at Midwest Sports and Pain Specialists for an initial evaluation. (R. 406-09). On March 17, 2008, Dr. Tata performed a spinal lumbar CT and lumbar provocative discography. (R. 402-05). The CT revealed "extensive degenerative changes" at L4-L5, an annular tear and a small focal bulge, and bilateral spondylolysis without evidence of spondylolisthesis, as well as "extensive degenerative changes" at L5-S1 including marked loss of disc height and gas within the disc space. (R. 402-03). Dr. Tata advised Plaintiff to follow up with a post-discography CT "to further elucidate disk morphology." (R. 405).

## 2. Plaintiff's Back Surgery and Post-Operative Pain

Several days after the discography, Plaintiff complained of pain to Dr. Johnson, who reviewed the discogram and MRI with Plaintiff and discussed the option of anterior

lumbar interbody fusion surgery, as well as alternatives to surgery. (R. 419). On May 14, 2008, Dr. Johnson performed the surgery at the L5-S1 level. (R. 416-17).

At a post-surgical visit on May 28, 2008, Dr. Johnson noted that Plaintiff is "doing very well postoperatively," prescribed Norco for pain, and restricted Plaintiff from working until his next follow-up visit in one month. (R. 415, 438). But at the next follow-up on July 1, 2008, Plaintiff reported that he had been experiencing back pain in the prior two weeks similar to the pain he experienced pre-surgery. (R. 526). Plaintiff had not used pain medication since shortly after his last visit because his workers compensation insurance did not approve it. (*Id.*). He stated that his pain is worse when he lies down at night and when he sits, particularly when he sits without the brace. (*Id.*). An x-ray of his spine that same day revealed the interbody fusion with plate-screw at L5-S1, and the radiologist noted that the "position and alignment appears to be no significant change since last examination[;] bony spur is again noted at the level of L3-L4." (R. 544).

On July 7, 2008, Dr. Towfig Arjmand prepared a Physical RFC Assessment for the Illinois Disability Determination Services ("DDS") based on a primary diagnosis of spondylolisthesis. (R. 729-36). Dr. Arjmand concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) about 6 hours in an 8-hour work day, sit (with normal breaks) about 6 hours in an 8-hour work day, and has no limitations on his ability to push or pull. (R. 730). Dr. Arjmand found that Plaintiff is occasionally limited in climbing, balancing, stooping, kneeling, crouching, and crawling due to his back pain. (R. 731). Finally, he found that Plaintiff has no manipulative, visual, communicative, or environmental limitations. (R.

732-33). Dr. Arjmand found Plaintiff's statements concerning his symptoms "fully credible," but concluded based on the medical evidence of record that "it is anticipated that the claimant will make a satisfactory recovery from back surgery on 5/14/08 before the completion of the 12-month duration period." (R. 736).

Plaintiff continued to receive follow-up care from Dr. Johnson. On August 14, 2008, Plaintiff rated his pain as 5 out of 10 and said he has trouble getting out of bed in the morning, but feels better after he walks. (R. 531). He told Dr. Johnson that the pain increases if he does not take Norco three times a day. (*Id.*). Dr. Johnson refilled Plaintiff's Norco prescription, advised physical therapy and weaning off the TLSO brace, explained work conditioning and hardening, and noted that Plaintiff "should anticipate being off of work for at least another six weeks and possibly even three months as his job requirements require him to lift up to 100 lbs." (R. 532). A post-operative x-ray taken that same day showed "[n]o acute fractures or subluxations" and "[p]ostsurgical changes of L5-S1 fusion with spondylolysis at this level, stable since 7/1/2008." (R. 740).

Between July 29 and October 16, 2008, Dr. Johnson refilled Plaintiff's prescription for three Norco pills per day. (R. 529, 532, 534, 536, 538, 542). According to his insurance company, Plaintiff had been prescribed pain medications from four different practices as of mid-August 2008. (R. 530). On August 20, 2008, physical therapist Sara Ochoa of Physiotherapy Associates noted that Plaintiff complained of "general fatigue in the trunk and extremities as well as pain [in his] mid to low back at a 5-6/10 level," which is provoked by "sitting greater than 60 minutes or standing greater than 30 minutes. (R. 546).

8

On October 7, 2008, Plaintiff told Dr. Johnson that he has good days and bad days and is sleeping "much better," waking up 3-4 times per night compared to 7-8 times previously. (R. 537). He had "a fair amount" of back pain due to being in the car for forty minutes to get to the appointment. (*Id.*) Dr. Johnson recommended that Plaintiff discontinue the TLSO brace and continue therapy, and explained to Plaintiff that recovery from this type of type of injury can take up to one year and that he is healing as expected. (*Id.*).

On October 28, 2008, Dr. Richard Bilinsky completed a Request for Medical Advice for the DDS upon reconsideration, in which he affirmed, as revised, Dr. Arjmand's RFC assessment of July 7, 2008. (R. 742-44). Dr. Bilinsky reviewed the subsequent medical evidence, including an August 14, 2008 x-ray showing that the fusion is "stable" and Dr. Johnson's examination notes of October 7, 2008 which observed that Plaintiff's "gait is normal, weaning out of back brace, [and] going to PT." (R. 744). Dr. Bilinsky found Plaintiff "partially credible" given that he "likely" can perform more activities than his activities of daily life indicate, and concluded that the "RFC remains appropriate." (*Id.*).

On November 18, 2008, Plaintiff had his six-month postsurgical follow-up with Dr. Johnson. (R. 783). Dr. Johnson noted that Plaintiff had weaned off the TLSO brace and that his physical therapy program was increased the previous week, causing soreness in his lower back, where previously he was "achy," but not causing his pre-operative pain to return. (*Id.*). Moderations to his therapy program were helping with his symptoms, and he was taking Norco once or twice a day. (*Id.*). Dr. Johnson concluded that Plaintiff "is doing well postoperatively" and should continue therapy for six weeks

followed by home exercise. (*Id.*). Dr. Johnson indicated he would discuss work hardening/conditioning with Plaintiff in six weeks. (*Id.*)

On January 7, 2009, Dr. Johnson gave physical therapist Ochoa approval to begin work conditioning/hardening based on Ochoa's assessment that Plaintiff "is doing very well and feels he can start this." (R. 786). Five days later, on January 12, 2009, Plaintiff reported by phone that he had stopped taking pain medication three weeks ago and his lower back pain increased about a week and a half ago, to the level of 5 or 6 out of 10, as he increased the weights and repetitions in physical therapy. (R. 788). He was told that he may be sore and need pain medication as he increases his activity, and was given a prescription for Ultram. (*Id.*). That same day, physical therapist Ochoa informed Dr. Johnson that Plaintiff "reports he is feeling 'ok' although he has pain on his left side. (R. 745). She assessed his functional tolerance as sitting and standing for 30-45 minutes, walking for 45 minutes, driving for 15 minutes, and therapy activity for 75 minutes with frequent breaks. (*Id.*). Ochoa concluded that Plaintiff "demonstrates very good potential for progression to work conditioning program incorporating body mechanics education and ergonomics." (*Id.*).

A few days later, at his follow-up visit on January 15, 2009, Plaintiff complained to Dr. Johnson of low centralized back pain over the prior two weeks at a pain level of 3-4 out of 10 during the day and 8 out of 10 when lying down at night. (R. 790). Dr. Johnson noted that Plaintiff had begun work conditioning and that the prior week "they increased the weights and repetition, and this week they increased therapy from 1.5 hours per day to this week 3 hours per day." (*Id.*) Plaintiff had stopped taking Norco,

however his prescriptions for Ultram and Tylenol for pain were refilled and he was prescribed Arthrotec, an anti-inflammatory. (R. 791).

Plaintiff continued to show progress in physical therapy. For example, on January 22, 2009, Ochoa reported that Plaintiff "demonstrates fair potential to progress towards goals for all lifts and carries...[and] a progression of 3-4 lbs a week will be focused on to allow him to reach his goals in a timely manner." (R. 746). On February 9, 2009, Ochoa reported that Plaintiff reports his lower back is feeling "better" and that he "demonstrates a 30-38% gain in his OCC lifts compared to last assessment two weeks ago." (R. 747).

At a follow-up visit to Dr. Johnson on February 19, 2009, Plaintiff stated that, "Occasionally when he leaves therapy, he feels low back pain. He feels he is progressing most of the time, but at night he has pain when trying to sleep and also has bad days and he wonders if he truly is progressing." (R. 793). At this point, he was participating in work conditioning four days a week for 3.5 hours per session and gradually increasing weights. (*Id.*). Dr. Johnson noted that Plaintiff "mentions that for the most part he does feel improved and feels good and has fewer bad days," and advised him to continue with therapy and work conditioning/hardening. (*Id.*). Dr. Johnson also noted, "It was again discussed that he is progressing and should continue to progress with time. It was explained that there is no guarantee that he will have resolution of symptoms and that was explained at the time of the surgical discussion." (*Id.*).

On March 9, 2009, Ochoa reported that Plaintiff "continues to make good gains toward goals," and that his "[b]ody mechanics and dynamic/static balance are excellent

with all tasks." (R. 748). Plaintiff "reports he continues to see improvements in strength and endurance, but is frustrated that his back continues to be achy/painful along the center." (*Id.*). Ten days later, on March 19, 2009, Ochoa reported that Plaintiff complained of isolated left lateral back pain, left inner thigh symptoms, and restless sleep. (R. 749). Ochoa further reported that Plaintiff demonstrated work in the medium physical demand level for all categories and in the heavy level for some activities. (*Id.*).

At a visit to Dr. Johnson on March 26, 2009, Plaintiff complained of worsening low back and left leg pain, and left groin and left medial thigh pain that pre-dated the surgery. (R. 800). Dr. Johnson noted that the physical therapist believes the pain "is muscular in nature," and recommended that Plaintiff obtain a Functional Capacity Evaluation ("FCE") to assess his current abilities. (R. 800-01).

Although the record does not appear to contain the FCE, Plaintiff had a post FCE follow-up appointment with Dr. Johnson on April 16, 2009. (R. 803-04). Plaintiff reported that he needed to take breaks during the FCE due to his rising heart rate and that post-FCE "he has had quite a bit of increase in pain in the low back." (R. 803). Dr. Johnson noted that, per the FCE, Plaintiff "did not demonstrate the ability to return to his previous position" at the heavy physical demand level, and "demonstrates the ability to perform within light physical strength level, but sedentary duty may not be tolerated." (R. 804). Dr. Johnson recommended another eight weeks of work conditioning/hardening. (*Id.*).

On May 1, 2009, physical therapist Swati Amin of Alliance Physical Therapy prepared a work conditioning progress report which stated that Plaintiff shows "improvement" in his lower back pain, his "pain intensity has decreased," and he is able

12

to participate in work conditioning on a daily basis. (R. 753-60). Amin also reported that Plaintiff still has a high pulse rate with increased activity and strengthening exercises and that he will benefit from further therapy. (R. 754). On May 19, 2009, at a monthly follow-up required by Plaintiff's workers compensation insurance, Dr. Johnson noted that Plaintiff missed two weeks of physical therapy because workers compensation did not approve it, but that he does a home exercise program. (R. 805). Plaintiff reported that he experiences low back pain and leg numbness after walking about one mile. (R. 806). Dr. Johnson encouraged Plaintiff to walk daily as tolerated. (*Id.*).

At his next follow-up on June 25, 2009, Plaintiff reported to Dr. Johnson that workers compensation approved twelve therapy visits, but would not approve more until he had an Independent Medical Examination ("IME"). (R. 807). Plaintiff denied any change in his condition and told Dr. Johnson that he is not improving, rating his average low back pain at a two out of ten, more towards the left, and not exceeding a five out of ten. (*Id.*). Dr. Johnson concluded that Plaintiff "has had therapy with a spine specialist without any improvement, [and] it is felt that his current symptoms may be the best he will be." (R. 808). Dr. Johnson noted that "his symptoms are related to the sacroiliac joint" and that further surgery "is not recommended." (*Id.*). Dr. Johnson discussed with Plaintiff sedentary to light duty work or vocational retraining. (*Id.*). According to Dr. Johnson, Plaintiff underwent an IME on May 28, 2009. (R. 809), and on July 10 Dr. Johnson cleared Plaintiff to proceed with work hardening as recommended in the IME. (R. 809).

On July 27, 2009, physical therapist Amin completed a Functional Abilities Evaluation of Plaintiff. (R. 811-24). Amin concluded that Plaintiff "has demonstrated physical abilities to perform within the light to modified medium level of physical strength requirements as defined by the U.S. Department of Labor," which "means that he is able to lift/lower 20-30 lb and carry up to 35 lb on [an] occasional basis and 10 lb on [a] low frequent basis." (R. 811). Amin further found that Plaintiff is unable to return to his prior job because he "did not demonstrate the necessary standing, sitting, climbing, lifting, carrying, pushing, pulling, [and] bending tolerances" necessary to perform the job, with the primary barriers being decreased lift/lower ability due to pain and weakness, decreased core strength, and sacroiliac dysfunction contributing to his pain. (*Id.*) Regarding Plaintiff's plan, Amin reported as follows:

> Patient reports experiencing pain in left paralumbar and upper gluteal region. Bending, squatting, lift/carry over 30-35 lb increases pain. Pain in lumbar area increases with increased weight bearing and bending or squatting activities. Pain used to decrease after SI mobilization when he was in therapy. Squatting or lifting from floor level is [sic] still increase pain and not tolerated well.

(R. 812). Amin also specified that Plaintiff's pain intensity was 0-1/10 at best and 5/10 at worst, with one instance two weeks prior where his pain increased to 8/10 "because he was not able to lie down and rest during day time due to busy day." (*Id.*) The evaluation concluded that Plaintiff's "present physical demand ability" is "[l]ight to medium physical demand level." (R. 813).

### 3. Plaintiff's Independent Vocational Evaluation

On September 18, 2009, vocational counselor James Boyd administered a series of tests and prepared a Vocational Evaluation Report "to assess [Plaintiff's] skill level and competitive employment potential." (R. 825-31). On the Beta III test to assess

nonverbal intelligence, Plaintiff demonstrated average non-verbal reasoning and a satisfactory level of conceptual reasoning. (R. 826-27). On the Career Ability Placement Survey, Plaintiff scored above average on manual speed and dexterity, slightly above average on mechanical reasoning and language usage, average on perceptual speed and accuracy, and below average on spatial relations, verbal reasoning, numerical ability, and word knowledge. (R. 827). The Oral Directions Test showed that Plaintiff has an average ability to understand, retain, and carry out verbal instructions in written form. (*Id.*) On the Typing Master test, Plaintiff demonstrated good accuracy and low typing speed, which Mr. Boyd found would likely improve with additional training, practice and use. (R. 828). The Career Occupational Preference System survey indicated that Plaintiff's interests focus around the Skilled Science, Professional Service, and Skilled Service clusters. (R. 828-29). Finally, a self-administered Career Orientation Placement & Evaluation Survey indicated that Plaintiff's most important work values are practical, conformity, orderliness, and realistic, which Mr. Boyd noted correlates with Plaintiff's occupational interests. (R. 829-30).

Based on this evaluation, as well as Plaintiff's medical restrictions, Mr. Boyd concluded that Plaintiff is unable to return to his previous work as a delivery truck driver and that his skills are not transferable to occupations within his physical/functional capacity. (R. 830-31). Mr. Boyd recommended computer and keyboarding skills training, noting that a training period "will be an important indicator of his endurance for sustained work activity." (R. 831). Mr. Boyd also recommended vocational counseling and job development and placement assistance. (*Id.*)

**B.      Plaintiff's Testimony**

Almost a year and a half later, at a hearing before the ALJ on January 5, 2011,
Plaintiff testified about the symptoms and limitations arising out of his back injury.  (R.
55-75).   Plaintiff said that in the days following his injury on February 7, 2007, the
company's doctor gave him pain medication and took him off work for a couple weeks,
but when he returned to work in March his back "just started killing [him] again."  (R. 58).
Plaintiff's personal doctor cleared him for light work duty, which his employer allowed
until the end of July, after which they said he would no longer be able to keep his job.
(R. 59).  Plaintiff testified that he continued physical therapy throughout 2007 into 2008,
when fusion surgery was approved by his workers compensation plan and performed in
May 2008. (R. 59-60).

Before the surgery, Plaintiff experienced pain in his middle low back like a
constant "electrical current going down [his] left leg."  (R. 60-61).  After the surgery,
Plaintiff did not feel relief "for a long time," although he understood from Dr. Johnson
that "that was expected." (R. 61).  He did physical therapy until his therapists concluded
that he was doing well enough to proceed to work conditioning.  (R. 62).  According to
Plaintiff, because the workers compensation representatives expected him to make a
full recovery in two months' time, his therapists increased the weights for lifting, twisting,
pushing, and pulling every other day, which increased his total conditioning time to four
or five hours per day.  (*Id.*).  After these sessions, he "wouldn't be able to do anything"
and was in so much pain that his wife would sometimes have to help him stand up.  (R.
63).  Plaintiff testified that, at the time he stopped treatment with Dr. Johnson, the doctor

told him that "he did everything that was possible with therapy and the surgery to make the full recovery," but "there's nothing else that [he] can do." (*Id.*).

In terms of his pain, Plaintiff testified that his current condition was "not really" different than his condition in July 2009. (R. 63). When asked to describe his current condition, Plaintiff said that he has pain, "especially when it gets colder," and that it shoots from his lower center back "up to [his] shoulders and down to [his] left leg." (R. 63-64). In the month before the hearing, "there was not one day that [he] didn't go without any pain," and even if there is a day or two without pain, it returns as soon as he does "something out of the ordinary," such as sitting too long. (R. 64). Because of the pain, he lies down "at least four or five times" a day, usually for a half hour or longer. (*Id.*). During the time he did work conditioning, all he could do was "lay down and go to therapy," and he "just wasn't able to do anything" outside of the sessions. (R. 65).

Since completing physical therapy, Plaintiff averages about four hours of intermittent sleep per night. (R. 66). Every time he turns in his sleep, he wakes up because "the pain comes back," and then it takes about a half-hour to fall back to sleep. (*Id.*). To get out of bed in the morning, Plaintiff testified that, "I bend my knees face upwards, and I put my knees together, and I just rock them back and forth to try to loosen up my back," which takes half an hour to an hour or longer. (R. 66-67). He is able to dress and bathe himself, but sometimes his wife has to help him wash his lower body when is unable to bend. (R. 67).

In terms of his daily activities, Plaintiff typically takes his son to school, eats a simple breakfast, sits "for a while" on the couch or a kitchen chair, lies down for a half hour, and then uses the computer or watches TV depending on how he's feeling. (R.

67-68). He does laundry about once a week and sometimes goes to the grocery store by himself. (R. 72). He sometimes washes dishes, but can only do so for five minutes before feeling pain and needing to lie down. (R. 68). Plaintiff testified that "there's nothing that I sit down or stand up doing constantly." (*Id.*).

As far as social activities, Plaintiff testified that he socializes with his family in his home, but cannot go to the movie theatre because he cannot sit for that long. (R. 72, 75). He no longer attends church and does not do any yard work. (R. 72). He only attends his children's school events if they are not lengthy or if there is comfortable seating and he can alternate sitting and standing. (R. 73).

Plaintiff tries to limit the amount of time he drives to a half hour, and is more comfortable if someone else is driving so he can recline the seat to lie down. (R. 71-72). On occasion he has asked his wife to pull over so he could get out and walk around to alleviate his pain. (R. 72). His wife drove him to the hearing, but he said he was in pain due to the time in the car and sitting for his testimony. (R. 70-71). Cold weather also aggravates his pain, and he continues to fatigue easily. (R. 70).

Plaintiff assessed his daily pain level as a three on a scale of one to ten, but increasing to a seven or eight if he does too much activity, such as going to the grocery store or walking too much. (R. 69-70). He said that it is a struggle to sit or stand for more than 30 to 40 minutes before he has to change positions, and he is "always … alternating back and forth" between sitting and standing. (R. 73). He does not know how much weight he can lift because he has not tried any lifting since he stopped therapy, but he can lift grocery bags that he estimates weigh about five pounds. (R.

74). He has not had any further treatment since completing physical therapy in July 2009, and he no longer takes pain medication for his pain. (*Id.*).

## C.  Vocational Expert's Testimony

Michelle Peters testified at the hearing as a vocational expert ("VE"). (R. 75-80). She identified Plaintiff's past relevant work as a truck driver and classified it as semi-skilled work at the medium physical demand level that was performed at the heavy level. (R. 76). The ALJ then described to the VE a hypothetical individual of Plaintiff's age, education, and work experience who is limited to light work; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; and must avoid exposure to extreme temperatures, particularly cold temperatures. (*Id.*). The VE testified that such an individual would be unable to perform Plaintiff's past relevant work, but could perform other jobs in the Chicago area, including cashier (8,500 positions), assembler (3,500), and hand packager (2,500). (*Id.*). The VE stated that the cashier position would not allow the opportunity to alternate between sitting and standing every 30 minutes, and the other positions would be reduced by approximately 50 percent to accommodate a sit/stand option. (R. 76-77). In addition, there would be approximately 1,000 positions for an inspector job with the sit/stand option. (R. 77). The ALJ then revised the hypothetical to assume the same factors and limitations, including the sit/stand option, but further restricting the individual to sedentary work. (R. 77). The VE testified that such an individual would be able to perform jobs such as assembler (1,000 positions), hand packager (850), and inspector (750). (*Id.*).

Plaintiff's attorney then revised the light work hypothetical to include the sit/stand option, but adding the additional limitation that the individual is "off task as much as 15 to 20 percent of the later hours of the day." (R. 78). The VE testified that such an individual would not be able to sustain any of these positions, and that this would also be the case for the sedentary jobs. (*Id.*). Next, Plaintiff's attorney revised the light and sedentary work hypotheticals to add the additional limitation that the individual needs one unscheduled half hour break per day to lie down, in addition to the two 15-minute breaks per day. (*Id.*). The VE testified that such an individual would not be able to sustain any of these jobs. (*Id.*). Finally, Plaintiff's attorney asked the VE if the individual could sustain employment if he is an hour and a half late to work, two to three times per month, due to pain and difficulty getting out of bed in the morning, to which the VE replied, "It's likely it would not be tolerated in competitive employment." (R. 79).

## D.    ALJ's Decision

In her decision, the ALJ found Plaintiff disabled under the relevant provisions of the Social Security Act from February 7, 2007 through July 27, 2009, but medically improved and not disabled beginning July 28, 2009. (R. 24-35). In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of February 7, 2007. (R. 27). At Step 2, she determined that Plaintiff has the severe impairments of "status post fusion secondary to work injury and degenerative disc disease." (R. 28). At Step 3, however, the ALJ determined that none of these impairments or combination of impairments met or medically equaled any of the listed

impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1, nor did Plaintiff's attorney argue otherwise. (*Id.*).

At Step 4, the ALJ concluded that from February 7, 2007 through July 27, 2009, Plaintiff had the residual functional capacity to perform "less than sedentary work" as defined in 20 C.F.R. § 404.1567(a) because Plaintiff could not sustain the requirements of full-time employment due to a combination of medical conditions and associated pain. (R. 28-30). At Step 5 for this time period, she found that he was unable to perform his past work as a truck driver and was unable to adjust to other work available in the national economy, thus she found that Plaintiff was under a disability during this time period. (R. 30-31, 35).

However, the ALJ went on to conclude that Plaintiff's disability ended as of July 28, 2009 when medical improvement occurred. (R. 31). Beginning on this date, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except Plaintiff "must have the option to sit and/or stand at will every thirty minutes," he " should never be required to climb ladders, ropes, or scaffolds; and only occasionally be required to climb ramps and stairs, balance, stoop, kneel, crouch, or crawl," and also "must avoid concentrated temperature extremes." (R. 31). In reaching this determination, the ALJ considered Plaintiff's testimony concerning his constant pain and his limited ability to engage in activities such as sitting and lifting. (R. 32). The ALJ found it significant that Plaintiff had not had any treatment for his back since completing physical therapy in July 2009. (R. 32). The ALJ also gave great weight to a July 2009 functional abilities examination by Plaintiff's physical therapist, Swati Amin, which demonstrated that although Plaintiff had muscle

tightness and tenderness, he had considerable lifting capabilities, range of motion within functional limits, normal balance, and the ability to walk without assistive devices, leading the physical therapist to conclude that Plaintiff was capable of light to medium work. (R. 32-33). The ALJ also noted that the functional assessment was consistent with Plaintiff's own reports to treating physician Dr. Johnson, including statements on May 19, 2009 that he had low back pain and numbness after walking one mile and on June 25, 2009 that his pain that "was only level 2/10" and that it "no longer exceeds a level 5/10." (R. 31, 33). The ALJ also found the assessment consistent with Dr. Johnson's discussion with Plaintiff about sedentary or light work or vocational retraining. (*Id.*). The ALJ gave minimal weight to the September 2009 opinion of Plaintiff's vocational evaluator, James Boyd, that Plaintiff "would have 'difficulty physically tolerating a full-time, 8-hour per day work schedule'" because Mr. Boyd is not a physician or a treating source and his opinions were based on Plaintiff's subjective statements rather than any objective testing. (*Id.*) Accordingly, the ALJ found Plaintiff not entirely credible given the lack of treatment indicated by the record since July 2009 and the objective findings and Plaintiff's own subjective statements concerning his pain and physical capabilities through July 2009 as reported by Dr. Johnson and physical therapist Amin. (*Id.*)

The ALJ then found that Plaintiff is unable to perform his past relevant work, but relying on the VE, concluded that there are other jobs that exist in sufficient numbers in the Chicago region that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 34). Accordingly, the ALJ found that Plaintiff was not disabled since his disability ended on July 28, 2009. (*Id.*).

## DISCUSSION

**A.      Disability Standard**

A claimant who can establish he is "disabled" as defined by the Social Security Act, and was insured for benefits when his disability arose, is entitled to Disability Insurance Benefits.    42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009).    "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."    42 U.S.C. §§ 423(d)(1)(A).    An individual is under a disability if he is unable to do his prior work and cannot, given his age, education, and work experience, engage in any gainful employment existing in the national economy. *Id.* at § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted).    "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.    A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."    *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

**B.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act.  42 U.S.C. § 405(g).  A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law."  *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).  Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'"  *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).   The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the conclusion.'"  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

**C.     Analysis**

The Court now addresses in turn each of Plaintiff's arguments challenging the ALJ's decision.

**1.      Opinion of Physical Therapist Swati Amin**

Plaintiff first argues that the ALJ mischaracterized the Functional Abilities Evaluation dated July 27, 2009 and prepared by Plaintiff's physical therapist, Swati Amin, as it relates to Plaintiff's standing limitations.  Specifically, Plaintiff contends that

"while the therapist indicated that [Plaintiff] could perform within the light to medium level (R. 811), therapist Amin also reported that standing could only be done for 30 minutes at a time with standing in one spot being a challenge (R. 814)." (Doc. 21 at 16). Amin specified the 30-minute standing limitation under the column for "occasional" ability demonstrated. Thus, Plaintiff argues that the 30-minute sit/stand option in the RFC does not account for this limitation because "Plaintiff demonstrated the ability to stand for 30 minutes but within the 'occasional' context, which is considered to be up to only 1/3 of the work-day." (*Id.*, citing Social Security Ruling ("SSR") 83-10).

Opinions from non-physician providers, such as physical therapists, cannot be given controlling weight, but may be considered to show the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. §§ 404.1502, 404.1513(d); *see also Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004). Here, there is no medical evidence from a treating or non-treating physician to support the conclusion that Plaintiff can stand for only one-third of an 8-hour workday and, indeed, Plaintiff cites none. Nor is it clear from the Functional Abilities Evaluation form completed by PT Amin that she was aware of the 1983 Social Security Ruling defining "occasionally" in the context of exertional levels to mean "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, *5. In fact, PT Amin's own report suggests otherwise, given that she expressly concludes that Plaintiff has demonstrated the ability to perform at the light to modified medium physical demand level (R. 811, 813), both of which may require the individual to stand for more than one-third of an 8-hour day. *See* SSR 83-10, 1983 WL 31251, *5-6.

In any event, the ALJ found that PT Amin's assessment was consistent with treating neurosurgeon Dr. Johnson's conversation with Plaintiff in June 2009 discussing the possibility of sedentary or light work or vocational retraining (R. 33, citing R. 808), consistent with Plaintiff's own reports to Dr. Johnson concerning his pain level averaging 2 out of 10 and never exceeding 5 out of 10 (R. 31, 33), and not inconsistent with any other of Dr. Johnson's treatment notes and opinions (R. 33). Furthermore, as the ALJ notes in her decision, the RFC limits Plaintiff to light work even though PT Amin found him capable of performing at the light to modified medium level, resulting in a more restrictive RFC than even the physical therapist's report recommends. (R. 33).

Finally, upon questioning from the ALJ, the VE testified that a sufficient number of jobs would be available in the Chicago area even if Plaintiff was limited to sedentary work. (R. 77). While Plaintiff argues that he still would be precluded from performing sedentary work because of lateness and excessive breaks due to pain, he cites no medical evidence whatsoever to support such an assertion.[4] The ALJ left the matter open for 30 days after the hearing to allow Plaintiff an opportunity to submit additional medical evidence (R. 54-55, 79-80), but Plaintiff submitted only documentation of an office visit for anxiety, which did not address his back pain or shed more light on his physical limitations (R. 282-88). Thus, any error as to Plaintiff's standing limitations is

---

[4]     In addition to relying on PT Amin's assessment, Plaintiff also relies on his own hearing testimony that after a work conditioning session, "he would get home afterwards and not be able to do anything." (Doc. 21 at 18). But again, there is a complete dearth of medical evidence to support the conclusion that, as Plaintiff asserts, this required the ALJ to find that he would be off task 15-20% of each afternoon and would require an additional 30 minute break each day, rendering him unable to perform any jobs, even sedentary ones. (*Id.*) The lack of evidence of these restrictions is particularly problematic given that Plaintiff attempts to equate the demands of sedentary work to the demands of the cardiovascular and weight training activities that comprised his work conditioning program (R. 751), which by February 2009 he was performing for 3.5 hours per day four days per week at gradually increasing weights. (R. 793).

harmless because there were sufficient numbers of sedentary jobs available and Plaintiff failed to present evidence that he was unable to perform at the sedentary level.

## 2.      Opinion of Vocational Evaluator James Boyd

Plaintiff next argues that the ALJ erred by giving little weight to the opinion of Plaintiff's vocational evaluator, James Boyd, concerning "whether Plaintiff is vocationally capable of sustaining full-time employment." (Doc. 21 at 17). Boyd, an independent vocational counselor, evaluated Plaintiff in September 2009, approximately 16 months prior to the hearing before the ALJ. Mr. Boyd administered a series of tests to assess Plaintiff's vocational aptitudes and interests, but also opined on Plaintiff's functional capacity. (R. 825-31). The ALJ stated that she considered Mr. Boyd's opinion "that claimant could not do past work, and would have 'difficulty physically tolerating a full-time, 8-hour per day work schedule.'" (R. 33). The ALJ then determined not to give "great or significant weight" to this opinion given that Mr. Boyd "was not a treating source, nor is he a physician, nor did he have any sort of treating relationship with the claimant." (*Id.*) The ALJ also found that Mr. Boyd's opinions "were based on the subjective statements of the claimant and not as a result of any objective testing." (*Id.*).

Plaintiff argues that it was improper for the ALJ to assign little weight to Mr. Boyd's opinion on the ground that he is not a treating source. As Plaintiff puts it, this "is hardly much of a consideration because none of the vocational experts relied on by SSA's ALJs are ever treating sources, so that reason must fall by the wayside." (Doc. 21 at 16). Plaintiff also contends that it was error for the ALJ to reject Mr. Boyd's opinion because it was based on Plaintiff's own subjective testimony, given that Mr. Boyd also reviewed two functional abilities reports from physical therapist Swati Amin

and two documents from treating physician Dr. Johnson and consulting physician Dr. Dorning. (*Id.* at 17).

Plaintiff misses the point. An ALJ need not give deference to opinions of treating or nonexamining sources concerning a claimant's functional capacity or ability to work. *See* 20 C.F.R. § 404.1527(d)-(e) (determinations of a claimant's RFC and ability to work are reserved to the Commissioner). Indeed, vocational experts are not consulted for the purpose of determining a claimant's RFC. Rather, a vocational expert or specialist is consulted to offer an opinion concerning the physical and mental demands of a claimant's past relevant work and to offer an opinion in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of his previous work. 20 C.F.R. § 404.1560(b)(2). If a claimant cannot resume his prior work, an ALJ may also consult a vocational expert or specialist to determine if a claimant's work skills can be applied in other occupations. *Id.* at § 404.1566(e) ("If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.")

Here, the opinion that Plaintiff wishes the ALJ to credit does not fall within the expertise of a vocational expert or specialist. It is not an opinion about the demands of Plaintiff's past relevant work. Indeed, the ALJ and Mr. Boyd are in agreement that Plaintiff cannot perform his past work as a truck driver. (R. 34, 830). Nor does the opinion at issue concern which occupations Plaintiff may be able to perform given his

functional capacities.  Rather, Plaintiff asserts, without citing to any legal authority, that the ALJ must credit Mr. Boyd's statement arguably defining Plaintiff's medical restrictions, even though Mr. Boyd is not a medical professional and his statement is contradicted by the opinions of treating physician Dr. Johnson (who discussed sedentary or light work with Plaintiff) and treating physical therapist Swati Amin (who subsequently concluded Plaintiff could perform light to modified medium level work).  In fact, Mr. Boyd's statement itself acknowledges that he is not the authority to determine Plaintiff's physical capabilities: "There is some concern that Mr. Tirado will have difficulty physically tolerating a full-time, 8-hour per day work schedule.  This will need to be further clarified with his physician and/or therapist."  (R. 831).

Contrary to Plaintiff's assertions, the ALJ built a logical bridge between the evidence and her determination not to give great or significant weight to Mr. Boyd's statement questioning Plaintiff's physical capacity for work, given that he was not a treating source or a physician and that his statement was based on Plaintiff's subjective statements rather than any objective testing.  (R. 33).  In any event, Plaintiff cites no legal authority for the proposition that an ALJ must give weight to a vocational counselor's opinion concerning RFC or ability to work and, as noted above, there is none.  Accordingly, the ALJ did not err in giving little weight to Mr. Boyd's statement.

**3.   Credibility Assessment**

Finally, Plaintiff argues that the ALJ's credibility determination was improper. The ALJ found Plaintiff not credible concerning his limitations after July 2009 due to "the complete lack of treatment revealed by the record" and because Plaintiff's alleged limitations "are also unsupported by the objective findings and subjective statements of

29

the claimant through July 2009 as reported by Dr. Johnson and physical therapist Swati Amin, as noted above."  (R. 33).  Plaintiff argues that the ALJ failed to consider the reasons why Plaintiff did not seek treatment, as required by Social Security Ruling 96-7p, namely that Dr. Johnson told him "there was not really any more that could be done for him" and that "his insurance was terminated and he did not acquire Medicaid coverage until just shortly before the hearing."  (Doc. 21 at 17-18).

An ALJ's credibility finding is accorded deference and may be overturned only if it is "patently wrong."  *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)).  However, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record."  *Pepper*, 712 F.3d at 367 (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).  A claimant's lack of treatment may support an adverse credibility finding.  *Nicholson v. Astrue*, 341 F. App'x 248, 252 (7th Cir. 2009); *Craft*, 539 F.3d at 679.

As the ALJ observed, Plaintiff points to no evidence after July 2009 to suggest that he has limitations that prevent him from sustaining work.  Plaintiff does not now dispute the lack of treatment, but rather points to Dr. Johnson's statement in his June 25, 2009 treatment note that "it is felt that his current symptoms may be the best he will be" as definitive evidence that no further treatment was required.  (Doc. 21 at 17, citing R. 808).  But in the same treatment note, Dr. Johnson also states, "Continue present treatment plan" (R. 808), which at the time included regular physical therapy and work conditioning sessions.  Dr. Johnson also instructed Plaintiff to schedule follow-up visits with him as needed.  (*Id.*)  Thus, the doctor's express instructions belie Plaintiff's

contention that Dr. Johnson directed him to stop treatment and, to the contrary, show that Dr. Johnson encouraged Plaintiff to continue treatment.

Plaintiff also argues that, in any event, his insurance had been terminated rendering him unable to pay for further treatment during that time period. Plaintiff's attorney made a cursory assertion to this effect at the hearing in January 2011, noting that Plaintiff "just finally – the family got Medicaid. They got that as of October 31st." (R. 54-55). No mention was made of any prior insurance being terminated or whether Plaintiff's workers' compensation plan would continue paying for his therapy as it had previously, nor did Plaintiff himself testify about his insurance coverage. The ALJ left the record open for 30 days to receive additional evidence from Plaintiff, although it is not entirely clear whether the ALJ expected that supplemental submission to include documentation of the lack of insurance or just documentation of additional treatment (R. 54-55, 79-80). Plaintiff did not submit documentation supporting his lack of insurance coverage, thus the only purported evidence is Plaintiff's attorney's testimony. One month after the hearing, Plaintiff's attorney did submit a document showing that Plaintiff visited a doctor for anxiety in January 2011, but submitted no documentation of any complaints of or treatment for back pain or other physical limitations during the approximately three and a half months between obtaining Medicaid coverage on October 31, 2010 and his attorney's supplemental submission to the ALJ on February 11, 2011. (R. 282-88).

An ALJ must consider lack of insurance coverage as an explanation for lack of treatment before making a negative credibility determination. *Craft*, 539 F.3d at 678, citing SSR 96-7p. However, "an ALJ's credibility assessment will stand 'as long as

[there is] some support in the record.'" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Here, the evidence of Plaintiff's lack of insurance is weak, consisting solely of his attorney's testimony at the hearing, and Plaintiff did not avail himself of the opportunity to submit additional evidence on this issue after the hearing. Furthermore, in addition to Plaintiff's lack of treatment, the ALJ also relied upon the objective findings in the record concerning Plaintiff's limitations and Plaintiff's own subjective statements to Dr. Johnson and physical therapist Amin through July 2009 concerning his pain level and physical capabilities. (R. 32-33). As discussed above, this evidence does not support Plaintiff's assertion that he was unable to perform light work with a sit/stand option as specified in the RFC, let alone that he was unable to perform even sedentary work as Plaintiff now argues. *See Walker v. Astrue*, No. 11-107-JPG-CJP, 2011 WL 6122555, *7 (S.D.Ill. Aug. 19, 2011) (affirming negative credibility finding and rejecting argument attributing lack of treatment to lack of insurance where other record evidence supports credibility finding); *Bray v. Astrue*, No. 2:10-CV-00352, 2011 WL 3608573, *7 (N.D.Ind. Aug. 15, 2011) (same).

In the end, it is clear that this case does not turn on whether the ALJ found Plaintiff credible concerning his inability to work, but rather on the ample evidence from Plaintiff's treating physician and physical therapist establishing that he is capable of sustaining work within the limitations set forth in the RFC. Accordingly, there is sufficient evidence in the record to support the ALJ's credibility finding.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 19] is denied and Defendant's Motion for Summary Judgment [Doc. 29] is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: September 10, 2013        _____

SHEILA FINNEGAN
United States Magistrate Judge